**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS – EASTERN DIVISION**

| | |
|---|---|
| **MISSION TRADING LLC,** | ) Case No. |
| Plaintiff, | ) |
| v. | ) Judge |
| | ) |
| **PHYLLIS COSTANZA,** | ) Magistrate Judge |
| Defendant. | ) |

<u>**VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF**</u>

1.      Plaintiff Mission Trading LLC files this Verified Complaint for Injunctive Relief against Defendant Phyllis Costanza, a former employee. Ms. Costanza brazenly violated her restrictive covenants, solicited Mission Trading's clients and employees, disparaged Mission Trading and its CEO, violated her fiduciary duties, facilitated the theft of Mission Trading's proprietary information, tortiously interfered with Mission Trading's business relationships, and is creating a competing entity. It is evident that Ms. Costanza is misappropriating Mission Trading's clients, employees, and proprietary information to create an exact replica of Mission Trading.

2.      After resigning from Mission Trading, Ms. Costanza collaborated with two of Mission Trading's employees and these employees emailed themselves Mission Trading's proprietary information. One of the employees emailed a link to Mission Trading's data room to an external email address. *See* Group Ex. 1, ECF No. 1-1. Mission Trading's data room is Mission Trading's playbook, and contains Mission Trading's pitch book, presentations, investment processes, product details, financial information, legal documents, grant documents, sample customer agreements, and market research (collectively, "Playbook"). The same employee forwarded Mission Trading emails to Ms. Costanza's personal email address. Shortly after resigning from Mission Trading, Ms. Costanza solicited the Chief Technology Officer for Mission

1

Trading to join her and another (former) Mission Trading employee to create a competing entity. *See* Ex. 2, ECF No. 1-2.

3. Through Mission Trading's subsidiary, Mission Markets LLC,[1] Mission Trading facilitates outcome-based funding for foundations, corporations, governmental, and not-for-profit entities. Mission Trading created a model to list social outcomes that have been "verified," price those outcomes, and then facilitate connections between buyers and sellers. Mission Trading ensures that resources and investments are channeled to programs with the greatest impact. Through Mission Trading's specialized platform, proprietary data, and matching algorithms, Mission Trading provides donors with information regarding the impact of organizations. Mission Trading's CEO, Jason Saul, also created Mission Metrics LLC and the Impact Genome Registry, which allows any social program to report and verify its results.

4. Ms. Costanza was the President and Chief Operating Officer of Mission Trading. Upon information and belief, during her employment with Mission Trading, she solicited multiple clients away from Mission Trading, resulting in significant business loss to Mission Trading.

5. On May 13, 2024, Ms. Costanza orally resigned from her role. Two days after orally resigning, on May 15, 2024, Ms. Costanza contacted one of Mission Trading's clients around 7:00 am CST to interfere with the relationship and to disparage Mission Trading and its CEO Jason Saul: she informed the client that there was a material issue between her and the CEO, and she informed the client that the whole Mission Trading team had "departed" (these employees departed after Ms. Costanza contacted this client). This client had a MOU with Mission Trading. Due to Ms. Costanza's misconduct, this client paused its activities with Mission Trading.

---

[1] Mission Markets LLC is known in the market as OutcomesX, and was previously Outcomesx, LLC. In this Complaint, Mission Trading, Mission Markets LLC, and OutcomesX are collectively referred to as "Mission Trading."

6.      Shortly after her call with the client, Ms. Costanza sent Mission Trading an email attempting to recharacterize her resignation as a resignation for Good Reason.

7.      Izzy Costanza and Caroline Herriman were both Directors for Mission Trading prior to their recent resignations. Defendant hired Izzy Costanza, her daughter. Defendant also hired Caroline Herriman, her daughter's friend. At Defendant's direction, Izzy Costanza resigned on May 17, 2024, and Caroline Herriman resigned on May 20, 2024. After Defendant resigned – but before Ms. Herriman resigned – Ms. Herriman emailed to herself a link to Mission Trading's data room and Playbook on May 15, 2024. Ms. Herriman forwarded that link to her personal email address the next day. On May 17, 2024, Ms. Herriman forwarded several emails to the personal email address for Defendant, including an email regarding an investor pitch deck.

8.      One week after Defendant resigned, on May 20, 2024, Defendant called John David Douglas, who provided services to Mission Trading as a Chief Technology Officer. Mr. Douglas memorized the call in an email to Defendant and to Izzy Costanza. *See* ECF No. 1-2. During that call, Defendant discussed her competing company, solicited Mr. Douglas and requested that he work with her and not with Mission Trading, discussed staffing for her new entity, and discussed using AI tools for her new company. *Id.* Specifically, Mr. Douglas indicated that "We need to redesign markets. I request that Izzy rework the screen shots and requirements (please forward them to me)." *Id.* Mr. Douglas also stated "You requested that I work with you and not with Jason's team." *Id.* Mr. Douglas then sought corporate information for Defendant Phyllis Costanza's new entity. *Id.* On May 22, 2024, Mr. Douglas represented to Mission Trading's CEO that Mr. Douglas has been "speaking regularly" with Defendant.

9.      At the start of her employment, Defendant Phyllis Costanza agreed to restrictive covenants, including promises (a) not to use Mission Trading's confidential and proprietary

information, (b) not to solicit Mission Trading's customers during her employment and for one year after her employment terminated, (c) not to solicit Mission Trading's employees during her employment and for one year after her employment terminated, (d) not to disparage Mission Trading, and (e) not to compete with Mission Trading during her employment and for one year after her employment terminated. *See generally* Ex. 3, ECF No. 1-3, Employment Agreement. In addition, Defendant Phyllis Costanza owed a fiduciary duty of loyalty to Mission Trading as an employee and officer of Mission Trading.[2]

10.     Mission Trading requires all of its employees to sign agreements with confidentiality provisions. Defendant Phyllis Costanza's role as COO required her to ensure that all employees executed such agreements. To facilitate the theft of Mission Trading's materials, Defendant ensured that Izzy Costanza and Ms. Herriman did not finalize these agreements.

11.     Mission Trading requires its vendors and other business partners to sign non-disclosure agreements. Mission Trading also cuts off access to its system and servers when employees are terminated. And Mission Trading requires employees to use company issued devices.

12.     To facilitate investments, Mission Trading has created a data room. When Mission Trading provides access to third-parties to its data room, Mission Trading used Ansarada to protect the data room and to safeguard Mission Trading's intellectual property. Ansarada is highly-encrypted and used to ensure that proprietary information remains protected.

13.     Based on the combination of Mr. Douglas's email, Ms. Herriman's emails to herself and to Defendant, Defendant's failure to perform her duties as COO, and information Mission

---

[2] Ms. Costanza was also a member of Mission Trading, LLC and agreed to be bound by its Operating Agreement, which includes additional covenants and promises.

Trading has received from clients, it is evident that Defendant Phyllis Costanza directed Izzy Costanza and Ms. Herriman to steal and misappropriate Mission Trading's confidential proprietary information so that Defendant Phyllis Costanza could create an exact replica of Mission Trading (but without its CEO and majority owner, Jason Saul) using Mission Trading's Playbook.

14. Defendant's misconduct has caused substantial and irreparable harm to Mission Trading, including the potential loss of clients, loss of its entire team, and business interruption. To date, Mission Trading expects that it has lost more than $1,500,000.00 in loss revenue due to Defendant's misconduct.

15. Pending resolution of any dispute, Mission Trading seeks an injunction to preserve the status quo that,

a. prohibits Defendant Phyllis Costanza from using, possessing, or disclosing Mission Trading's confidential information and Playbook,

b. prohibits Defendant Phyllis Costanza from soliciting Mission Trading's clients, investors, or business partners for the next year,

c. prohibits Defendant Phyllis Costanza from hiring Mission Trading's employees for the next year,

d. prohibits Defendant Phyllis Costanza from creating a direct competitor for the next year,

e. requires Defendant Phyllis Costanza to identify and return all of Mission Trading's confidential information,

f. requires Defendant Phyllis Costanza to identify all of Mission Trading's information in her possession, and

g. prohibits Defendant Phyllis Costanza from engaging in spoilation.

16.     Mission Trading is also seeking its attorneys' fees incurred in this matter.

17.     Mission Trading will seek monetary damages and other relief consistent with Defendant's Employment Agreement. Mission Trading reserves all legal rights pending the parties' dispute resolution provision in the Employment Agreement.

## PARTIES

18.     Mission Trading is Delaware limited liability company engaged in the business of connecting donors and social innovators. Its principal location is in Chicago, Illinois.

19.     Defendant resided in New York, NY at the start of her employment. Under the Employment Agreement, Defendant agreed to work from New York, New York. *See* Employment Agreement, ECF No. 1-3, § 3. Defendant currently lives in Aspen, Colorado.

## JURISDICTION AND VENUE

20.     This Court has subject matter jurisdiction over this dispute under 28 U.S.C. § 1331 because Mission Trading's claim against Defendant under the Federal Defend Trade Secrets Act, 18 U.S.C. § 1833, *et. seq.*, raises a federal question.

21.     Mission Trading's remaining claims fall within the Court's supplemental jurisdiction under 28 U.S.C. § 1367 because the claims are so related to the federal question that they form part of the same case or controversy.

22.     This Court has personal jurisdiction because Defendant agreed that Mission Trading "may seek injunctive relief [in] any state or federal court located in the state of Illinois, County of Cook to preserve the status quo pending resolution of any dispute." *See* Employment Agreement, ECF No. 1-3, §§ 15–16.

23.     Venue is proper in the United States District Court for the Northern District of Illinois under 28 U.S.C. § 1391(b) because Mission Trading and Defendant agreed that Mission

Trading "may seek injunctive relief [in] any state or federal court located in the state of Illinois, County of Cook to preserve the status quo pending resolution of any dispute." *See* Employment Agreement, ECF No. 1-3, §§ 15–16. In addition, Defendant conducted business in this District during her employment with Mission Trading.

<u>**COUNT I: BREACH OF THE EMPLOYMENT AGREEMENT**</u>

24.     Mission Trading adopts and re-alleges the allegations contained in paragraphs 1 through 23.

25.     Defendant signed the Employment Agreement on or around August 1, 2022 and resigned from Mission Trading on May 13, 2024.

26.     Mission Trading paid Defendant significant compensation, including $300,000 as base salary, and other compensation, in exchange for Defendant working as COO and agreeing to the restrictive covenants contained in the Employment Agreement. *See generally* Employment Agreement, ECF No. 1-3, §§ 4.1–4.6.

27.     Defendant worked for Mission Trading as the "President and Chief Operating Officer of the Company, reporting to the Company's CEO." *Id.* §2.1.

28.     Defendant agreed to perform the duties of COO, and agreed to work from New York, New York.

29.     In exchange for employment, substantial compensation, and access to sensitive materials, in Section 6, Defendant agreed to not use or disclose Mission Trading's Confidential Information. Defendant agreed and represented that "[Defendant] understands and acknowledges that during the Employment Term, she will have access to and learn about Confidential Information, as defined below." *Id.* § 6. Section 6.1(a) defined the term "Confidential Information." Defendant agreed and represented that

[Defendant] understands and acknowledges that the Company has invested, and continues to invest, substantial time, money and specialized knowledge into developing *its* resources, creating a customer base, generating customer and potential customer lists, training its employees, and improving its offerings in the field of social finance. The Executive understands and acknowledges that as a result of these efforts, the Company has created, and continues to use and create Confidential Information. This Confidential Information provides the Company with a competitive advantage over others in the marketplace.

*Id.* § 6(b). Defendant further

Agree[d] and covenant[ed]: (i) to treat all Confidential Information as strictly confidential; (ii) not to directly or indirectly disclose, publish, communicate or make available Confidential Information, or allow it to be disclosed, published, communicated or made available, in whole or part, to any entity or person whatsoever (including other employees of the Company) not having a need to know and authority to know and use the Confidential Information in connection with the business of the Company and, in any event, not to anyone outside of the direct employ of the Company except as required in the performance of the Executive's authorized employment duties to the Company or with the prior consent of the Manager acting on behalf of the Company in each instance (and then, such disclosure shall be made only within the limits and to the extent of such duties or consent); and (iii) not to access or use any Confidential Information, and not to copy any documents, records, files, media or other resources containing any Confidential Information, or remove any such documents, records, files, media or other resources from the premises or control of the Company, except as required in the performance of the Executive's authorized employment duties to the Company or with the prior consent of the Manager acting on behalf of the Company in each instance (and then, such disclosure shall be made only within the limits and to the extent of such duties or consent). Nothing herein shall be construed to prevent disclosure of Confidential Information as may be required by applicable law or regulation, or pursuant to the valid order of a court of competent jurisdiction or an authorized government agency, provided that the disclosure does not exceed the extent of disclosure required by such law, regulation or order. The Executive shall promptly provide written notice of any such order to the Manager.

The Executive underst[ood] and acknowledge[d] that her obligations under this Agreement with regard to any particular Confidential Information shall commence immediately upon the Executive first having access to such Confidential Information (whether before or after she begins employment by the Company) and shall continue during and after her employment by the Company until such time as such Confidential Information has become public knowledge other than as a result of the Executive's breach of this Agreement or breach by those acting in concert with the Executive or on the Executive's behalf.

*Id.* § 6(c).

30.     In addition to agreeing to not use, steal, or disclose Mission Trading's Confidential Information, and in exchange for employment, substantial compensation, and access to sensitive materials, Defendant agreed to covenants not to compete, not to solicit, and not to disparage. *See generally id.* §§ 7–8.

31.     Defendant agreed for the one-year period from Defendant's last of employment,

> not to engage in Prohibited Activity within the field of social finance or other business sector in which the Company is operating or has engaged in plans to operate with respect to any state in which the Company has customers within the last two (2) years of Executive's employment with the Company.

*Id.* § 7.2. The Agreement defined the term "Prohibited Activity" to mean

> is activity in which the Executive engages in the same or similar type of job responsibility and/or duties as what Executive engaged in for Company where Executive later seeks to provide same to any business that is a competitor or seeks to compete against Company, whether as employee, employer, owner, operator, manager, advisor, consultant, agent, partner, director, stockholder, officer, volunteer, intern or any other similar capacity. For purposes of this definition, a competitor is limited to a business engaged in or seeking to engage in field of social finance or other business sector in which the Company is operating or has engaged in plans to operate (of which Executive is aware of). Prohibited Activity also includes activity that may require or inevitably requires disclosure of trade secrets, proprietary information or Confidential Information.

*Id.*

32.     In exchange for employment, substantial compensation, and access to sensitive materials, Defendant agreed not to solicit Mission Trading's customers for one-year after the termination of her employment:

> The Executive agrees and covenants, . . . not to directly or indirectly solicit, contact (including but not limited to e-mail, regular mail, express mail, telephone, fax, and instant message), attempt to contact or meet with the Company's current, former or prospective customers for purposes of offering or accepting goods or services similar to or competitive with those offered by the Company. This restriction shall only relate to those Company customers that Executive learned of by virtue of her employment with the Company.

*Id.* § 7.3.

33.     In exchange for employment, substantial compensation, and access to sensitive materials, Defendant agreed not to solicit – or induce the termination of – Mission Trading's employees for one-year after the termination of her employment: "The Executive agrees and covenants not to directly or indirectly solicit, hire, recruit, attempt to hire or recruit, or induce the termination of employment of any employee of the Company. . . ." *Id.* § 7.4.

34.     In exchange for employment, substantial compensation, and access to sensitive materials, Defendant agreed not to disparage Mission Trading or Jason Saul, its CEO, and Mission Trading (and its employees) agreed not to disparage Defendant:

> The Executive agrees and covenants that she will not at any time make, publish or communicate to any person or entity or in any public forum any defamatory or disparaging remarks, comments or statements concerning the Company or its businesses, or any of its employees, officers. The Company agrees and covenants that it (including its agents and employees) will not at any time make, publish or communicate to any person or entity or in any public forum any defamatory or disparaging remarks, comments or statements concerning the Executive.

*Id.* § 8.

35.     Defendant agreed that if Defendant violated, or threatened to violate, her obligations to Mission Trading related confidentiality, non-competition, non-solicitation, or non-disparagement, then

> Executive hereby consents and agrees that the Company shall be entitled to seek, in addition to other available remedies, a temporary or permanent injunction or other equitable relief against such breach or threatened breach from any court of competent jurisdiction, without the necessity of showing any actual damages or that money damages would not afford an adequate remedy, and without the necessity of posting any bond or other security. The aforementioned equitable relief shall be in addition to, not in lieu of, legal remedies, monetary damages or other available forms of relief. Company shall be entitled to collect its reasonable attorney fees, expert fees and costs from Executive in the event Company is granted any injunctive relief against Employee to enforce the terms of this Agreement.

*Id.* § 10.

36. Defendant also agreed that upon her termination, Defendant would return to Mission Trading all of Mission Trading's property. *Id.* § 12.2.

37. Defendant agreed that the "Agreement, for all purposes, shall be construed in accordance with the laws of Delaware without regard to conflicts of law principles or inconvenient forum to the maintenance of such action or proceeding in such venue." *Id.* § 16.

38. In the Agreement, Defendant agreed to a mandatory dispute resolution provision, and also agreed that "[n]otwithstanding anything herein, Company may seek injunctive relief [in] any state or federal court located in the state of Illinois, County of Cook to preserve the status quo pending resolution of any dispute." *Id.* § 15; *see also* § 16 ("[n]otwithstanding anything herein, Company may seek injunctive relief [in] any state or federal court located in the state of Illinois, County of Cook to preserve the status quo pending resolution of any dispute.").

39. Defendant Phyllis Costanza has violated and breached several provisions of her Employment Agreement, necessitating an injunction.

40. Defendant Phyllis Costanza facilitated the theft of Mission Trading's Confidential Information and violated Section 6 of the Employment Agreement. Defendant Phyllis Costanza directed Ms. Herriman to forward emails and documents from Mission Trading to Defendant Phyllis Costanza's personal email address. And Defendant Phyllis Costanza directed Ms. Herriman and Ms. Izzy Costanza to steal Mission Trading's Playbook so that Defendant Phyllis Costanza can use the Playbook to create a competing entity. Ms. Herriman created a link to download Mission Trading's data room, and the data room contains Mission Trading's pitch book, presentations, investment processes, product details, financial information, legal documents, grant documents, sample customer agreements, and market research. Ms. Herriman then forwarded the link to her personal email address.

41.     Defendant Phyllis Costanza is creating a competing entity in violation of her non-competition obligations in Section 7 of the Employment Agreement. After her resignation, Defendant called Mr. Douglas to solicit his assistance in stealing Mission Trading's code and platform. Mr. Douglas memorialized that conversation and confirmed that she was creating a new entity, seeking to retain his services (and asking him to terminate his relationship with Mission Trading), and seeking to create the same code for her new competing entity. *See* ECF No. 1-2.

42.     Defendant Phyllis Costanza violated her non-solicitation promises in Section 7 of the Employment Agreement. After her resignation, Defendant induced two of Mission Trading's employees, Izzy Costanza and Caroline Herriman to resign from their employment. Based on Mr. Douglas's email, Defendant Phyllis Costanza has, or plans to, hire Izzy Costanza and Ms. Herriman for Defendant's new entity.

43.     Defendant Phyllis Costanza further violated her non-solicitation promises in Section 7 of the Employment Agreement by soliciting Mission Trading customers.

44.     Defendant Phyllis Costanza violated her non-disparagement promises in Section 8 of the Employment Agreement. Defendant has disparaged Mission Trading and Mr. Saul to customers, and to other third-parties.

45.     Defendant Phyllis Costanza's misconduct has caused Mission Trading substantial and irreparable harm.

46.     Without an injunction, Defendant will continue to use, divulge, disclose, acquire, or otherwise misappropriate Mission Trading's Confidential Information and Playbook, improperly compete against Mission Trading, solicit Mission Trading's clients and employees, and disparage Mission Trading and its CEO.

47.     Wherefore, Mission Trading requests that this Court enter an Order:

a.     Finding that Defendant Phyllis Costanza violated Sections 6, 7, and 8 of the Employment Agreement;

b.     Entering an injunction prohibiting Defendant Phyllis Costanza from violating Sections 6, 7,  and of the Employment Agreement;

c.     Entering an injunction prohibiting Defendant Phyllis Costanza from disclosing or using Mission Trading's Confidential Information;

d.     Entering an injunction requiring a forensic process to remediate Mission Trading's sensitive materials from Defendant Phyllis Costanza's devices and email;

e.     Prohibiting Defendant Phyllis Costanza from engaging in spoilation of evidence;

f.     Awarding Mission Trading its reasonable attorneys' fees and litigation expenses for seeking this injunctive relief; and

g.     Granting such other or further relief as the Court may deem just and proper.

**COUNT II: VIOLATION OF THE FEDERAL DEFEND TRADE SECRETS ACT**

48.     Mission Trading adopts and re-alleges the allegations contained in paragraphs 1 through 23.

49.     Defendant worked for Mission Trading between approximately August 1, 2022 and May 13, 2024.

50.     During her employment with Mission Trading, Defendant had access to Mission Trading's Playbook, including customer information, pricing information, investor pitches, legal documents, code, other intellectual property, and other sensitive documents.

51.     Mission Trading has spent substantial time and money developing its Playbook and sensitive materials.

52.     Defendant resigned from Mission Trading on or about May 13, 2024. On May 17, 2024, Defendant directed Ms. Herriman to send information and materials from Mission Trading to Defendant's personal email address.

53.     On May 15, 2024, Ms. Herriman created a link to download Mission Trading's data room, containing its Playbook. The data room contains Mission Trading's pitch book, presentations, investment processes, product details, financial information, legal documents, grant documents, sample customer agreements, and market research. Ms. Herriman then forwarded the link to her personal email address

54.     Defendant directed Ms. Herriman to create the link to the Playbook and directed Ms. Herriman to forward to Defendant the link to the Playbook.

55.     Defendant intends to use Mission Trading's Playbook and other Confidential Information to create a new entity that is an exact replica of Mission Trading.

56.     On May 20, 2024, Defendant called Mr. Douglas, who memorialized that Defendant contacted him to seek his assistance in creating a new entity, using Mission Trading's code for that new entity, soliciting clients and other business relationships for that new entity. *See* ECF No. 1-2.

57.     Mission Trading protects its sensitive and proprietary materials, which are not available to the general public, and Mission Trading closely guards the information. Mission Trading requires its vendors and other business partners to sign non-disclosure agreements. Mission Trading used Ansarada to protect the data room and to safeguard Mission Trading's intellectual property. Ansarada is highly-encrypted and used to ensure that information remains protected. After an employee's employment is terminated, Mission Trading terminates such employee's access to Mission Trading's systems and servers.

14

58.     Mission Trading also requires employees to sign agreements with confidentiality provisions. Defendant signed the Employment Agreement on August 1, 2022. Section 6 includes confidentiality and non-disclosure obligations for Defendant.

59.     Mission Trading's Playbook and other information is valuable to Mission Trading and would be valuable to Mission Trading's competitors because it will allow a competitor to create a shortcut to create a competitive company.

60.     Those outside of Mission Trading do not have access to such information without first signing a non-disclosure agreement.

61.     Mission Trading's Confidential Information, the information in the data room, and the Playbook are a trade secret under the Defend Trade Secrets Act because the information is not generally known outside of Mission Trading's business, Mission Trading takes reasonable steps to protect the information and to guard the secrecy of the information, the information provides value to Mission Trading's competitors, Mission Trading invested significant time and money in developing the information, others cannot easily acquire or duplicate the information, and Mission Trading continuously uses the information in its business. *See generally* 18 U.S.C. § 1833, *et seq.*

62.     Defendant has a contractual duty to not possess Mission Trading's Confidential Information, its data room, and its Playbook.

63.     Defendant acted in bad faith.

64.     Defendant misconduct has caused Mission Trading substantial and irreparable harm.

65.     Without an injunction, Defendant will continue to use, divulge, disclose, acquire, or otherwise misappropriate Mission Trading's Confidential Information and Playbook.

66.     Wherefore, Mission Trading requests that this Court enter an Order

a.    Finding that Defendant Phyllis Costanza violated Federal Defend Trade Secrets Act;

b.    Finding that Defendant Phyllis Costanza acted maliciously and willfully in violating the Federal Defend Trade Secrets Act;

c.    Entering an injunction prohibiting Defendant Phyllis Costanza from disclosing or using Mission Trading's Confidential Information, trade secrets, or Playbook;

d.    Entering an injunction requiring a forensic process to remediate Mission Trading's sensitive materials from Defendant Phyllis Costanza's personal devices and email account(s);

e.    Prohibiting Defendant Phyllis Costanza from engaging in spoilation of evidence;

f.    Awarding Mission Trading its reasonable attorneys' fees and litigation expenses for seeking this injunctive relief; and

g.    Granting such other or further relief as the Court may deem just and proper

**COUNT III – VIOLATION OF THE DELAWARE UNIFORM TRADE SECRETS ACT**

67.    Mission Trading adopts and re-alleges the allegations contained in paragraphs 1 through 23.

68.    Defendant worked for Mission Trading between approximately August 1, 2022 and May 13, 2024.

69.    During her employment with Mission Trading, Defendant had access to Mission Trading's Playbook, including customer information, pricing information, investor pitches, legal documents, code, other intellectual property, and other sensitive documents.

70.    Mission Trading has spent substantial money developing its Playbook and sensitive

materials.

71.     Defendant resigned from Mission Trading on or about May 13, 2024. On May 17, 2024, Defendant directed Ms. Herriman to send Mission Trading information and materials to Defendant's personal email address.

72.     On May 15, 2024, Ms. Herriman created a link to download Mission Trading's data room, containing its Playbook. The data room contains Mission Trading's pitch book, presentations, investment processes, product details, financial information, legal documents, grant documents, sample customer agreements, and market research. Ms. Herriman then forwarded the link to her personal email address

73.     Defendant directed Ms. Herriman to create the link to the Playbook and directed Ms. Herriman to forward to Defendant the link to the Playbook.

74.     Defendant intends to use Mission Trading's Playbook and other Confidential Information to create a new entity that is an exact replica of Mission Trading.

75.     On May 20, 2024, Defendant called Mr. Douglas, who memorialized that Defendant to solicit his assistance in stealing Mission Trading's code and platform. Mr. Douglas memorialized that conversation and confirmed that she was creating a new entity, seeking to retain his services (and asking him to terminate his relationship with Mission Trading), and seeking to create the same code for her new competing entity. *See* ECF No. 1-2.

76.     Mission Trading protects its sensitive and proprietary materials, it is not available to the general public, and Mission Trading closely guards the information. Mission Trading requires its vendors and other business partners to sign non-disclosure agreements. Mission Trading used Ansarada to protect the data room and to safeguard Mission Trading's intellectual property. Ansarada is highly-encrypted and used to ensure that information remains protected.

After the termination of employment, Mission Trading terminates such employee's access to Mission Trading's systems and servers.

77.     Mission Trading also requires employees to sign agreements with confidentiality provisions. Defendant signed the Employment Agreement on August 1, 2022. Section 6 includes confidentiality and non-disclosure obligations for Defendant.

78.     Mission Trading's Playbook and other information is valuable to Mission Trading and would be valuable to Mission Trading's competitors because it will allow a competitor to create a shortcut to create the same company.

79.     Those outside of Mission Trading do not have access to such information without first signing a non-disclosure agreement.

80.     Defendant entered into the Employment Agreement and agreed that "[t]his Agreement, for all purposes, shall be construed in accordance with the laws of Delaware without regard to conflict of law principles. . . ." *See* Employment Agreement, ECF No. 1-3, § 16.

81.     Mission Trading's Confidential Information, the information in the data room, and the Playbook are a trade secret under the Delaware Uniform Trade Secret Act because the information is not generally known outside of Mission Trading's business, Mission Trading takes reasonable steps to protect the information and to guard the secrecy of the information, the information provides value to Mission Trading's competitors, Mission Trading invested significant time and money in developing the information, others cannot easily acquire or duplicate the information, and Mission Trading continuously uses the information in its business. *See* DEL. CODE ANN. TIT. 6, § 2001, *et seq*.

82.     Defendant has a contractual duty to not possess Mission Trading's Confidential Information, its data room, and its Playbook.

83. Defendant acted in bad faith.

84. Defendant misconduct has caused Mission Trading substantial and irreparable harm.

85. Without an injunction, Defendant will continue to use, divulge, disclose, acquire, or otherwise misappropriate Mission Trading's Confidential Information and Playbook.

86. Wherefore, Mission Trading requests that this Court enter an Order

a. Finding that Defendant Phyllis Costanza violated the Delaware Uniform Trade Secret Act;

b. Finding that Defendant Phyllis Costanza acted maliciously and willfully in violating the Delaware Uniform Trade Secret Act;

c. Entering an injunction prohibiting Defendant Phyllis Costanza from disclosing or using Mission Trading's Confidential Information, trade secrets, or Playbook;

d. Entering an injunction requiring a forensic process to remediate Mission Trading's sensitive materials from Defendant Phyllis Costanza's devices and email account(s);

e. Prohibiting Defendant Phyllis Costanza from creating a direct competitor in which she will inevitably use Mission Trading's trade secrets;

f. Prohibiting Defendant Phyllis Costanza from engaging in spoilation of evidence;

g. Awarding Mission Trading its reasonable attorneys' fees and litigation expenses for seeking this injunctive relief; and

h. Granting such other or further relief as the Court may deem just and proper

## COUNT IV – BREACH OF FIDUCIARY DUTY OF FIDELITY AND LOYALTY
### (in the alternative to Counts II and III)

87. Mission Trading adopts and re-alleges the allegations contained in paragraphs 1

through 47.

88.    Defendant worked for Mission Trading as its President and Chief Operating Officer between approximately August 1, 2022 and May 13, 2024.

89.    Throughout her employment, Defendant owed a fiduciary duty of fidelity and loyalty to Mission Trading.

90.    Defendant received substantial compensation from Mission Trading.

91.    During her employment with Mission Trading, Defendant had access to Mission Trading's sensitive materials.

92.    Prior to her resignation from Mission Trading, Defendant disparaged Mission Trading and its CEO to clients and other third-parties.

93.    Prior to her resignation from Mission Trading, Defendant solicited clients from Mission Trading.

94.    Prior to her resignation from Mission Trading, Defendant created, or planned to create, a competing entity to directly mimic Mission Trading and provide and perform the same services as Mission Trading.

95.    Prior to her resignation from Mission Trading, Defendant solicited employees, or induced employees to terminate their employments with Mission Trading.

96.    Mission Trading has suffered severe damages because of Defendant's misconduct.

97.    Defendant acted in bad faith.

98.    Wherefore, Mission Trading requests that this Court enter an Order

        a.    Finding that Defendant Phyllis Costanza owed a fiduciary duty to Mission Trading and breached her fiduciary duty;

        b.    Finding that Defendant Phyllis Costanza engaged in willful and malicious

conduct in breaching her fiduciary duty;

        c.     Entering an injunction prohibiting Defendant Phyllis Costanza from disclosing or using Mission Trading's Confidential Information, trade secrets, or Playbook;

        d.     Prohibiting Defendant Phyllis Costanza from creating a direct competitor in which she will inevitably use Mission Trading's trade secrets;

        e.     Prohibiting Defendant Phyllis Costanza from engaging in spoilation of evidence; and

        f.     Granting such other or further relief as the Court may deem just and proper.

## COUNT V – TORTIOUS INTERFERENCE
## WITH CONTRACT AND BUSINESS EXPECTANCY
### (in the alternative to Counts II and III)

99.    Mission Trading adopts and re-alleges the allegations contained in paragraphs 1 through 47.

100.    Defendant worked for Mission Trading between approximately August 1, 2022 and May 13, 2024.

101.    Defendant received substantial compensation from Mission Trading due to her employment with Mission Trading.

102.    During her employment with Mission Trading, Defendant had access to Mission Trading's sensitive materials.

103.    Due to her employment with Mission Trading, Defendant became aware of Mission Trading's client relationships, business relationships, and employment relationships.

104.    Prior to her resignation from Mission Trading, Defendant disparaged Mission Trading and its CEO to clients and other third-parties.

105.    Prior to her resignation from Mission Trading, Defendant solicited clients from

Mission Trading.

106.    Prior to her resignation from Mission Trading, Defendant created, or planned to create, a competing entity to directly mimic Mission Trading and provide and perform the same services as Mission Trading.

107.    Defendant solicited Mission Trading's employees, or induced employees to terminate their employments with Mission Trading.

108.    Defendant intends to continue working with Mission Trading's former employees (Izzy Costanza and Ms. Herriman).

109.    Upon information and belief, after her resignation from Mission Trading, Defendant intends to continue working with one of Mission Trading's former employees (Caroline Herriman).

110.    Mission Trading maintained a business expectancy with its clients, employees, and other business relationships.

111.    Defendant tortiously interfered with Mission Trading's client, business, and employment relationships.

112.    Mission Trading has suffered severe damages as a result of Defendant's misconduct.

113.    Defendant acted in bad faith.

114.    Wherefore, Mission Trading requests that this Court enter an Order

        a.    Finding that Mission Trading had a business expectancy and that Defendant Phyllis Costanza tortiously interfered with Mission Trading's business expectancy;

        b.    Finding that Defendant Phyllis Costanza engaged in willful and malicious conduct in tortiously interfering with Mission Trading's business expectancy;

       c.      Entering an injunction prohibiting Defendant Phyllis Costanza from continuing to tortiously interfere with Mission Trading's business expectancies;

       d.      Prohibiting Defendant Phyllis Costanza from engaging in spoilation of evidence; and

       e.      Granting such other or further relief as the Court may deem just and proper.


Dated: May 24, 2024

                                   Respectfully submitted,
                                   Mission Trading LLC

                                   By: /s/ Kristen Prinz
                                   One of Plaintiff's Attorneys

The Prinz Law Firm, P.C.
Kristen E. Prinz (kprinz@prinz-lawfirm.com)
Amit Bindra (abindra@prinz-lawfirm.com)
1 East Wacker Street, Suite 1800
Chicago, IL 60601
P: (312) 212-4450
F: (312) 284-4822

**VERIFICATION**

Pursuant to 28 U.S.C. §1746(2), I, Jason Saul, declare under penalty of perjury that the allegations in this Verified Complaint are true and correct to the best of my current knowledge, except as to matters stated therein to be on information and belief and as to such matters the undersigned certified as aforesaid that I verily believes the same to be true. I am the CEO of Mission Trading, LLC.

Executed on this ___24___ day of May, 2024.

By (Signature): _____

By (Printed Name): ___Jason Saul_____

Title: ___CEO, Mission Trading_____

## **CERTIFICATE OF SERVICE**

I hereby certify that I served the foregoing to the Defendant's counsel via email at the last

known email address for Defendant:

Nathan M. Bull
Attorney at Law
nbull@mwe.com
McDermott Will & Emery
333 SE 2nd Avenue Suite 4500
Miami, FL 33131-4336

Dated: May 24, 2024

Respectfully submitted,
Mission Trading LLC

By: /s/ Kristen Prinz
One of Plaintiff's Attorneys

The Prinz Law Firm, P.C.
Kristen E. Prinz (kprinz@prinz-lawfirm.com)
Amit Bindra (abindra@prinz-lawfirm.com)
1 East Wacker Street, Suite 1800
Chicago, IL 60601
P: (312) 212-4450
F: (312) 284-4822